Filed 8/24/22 (unmodified opn. attached)

# IN THE SUPREME COURT OF CALIFORNIA

COUNTY OF BUTTE,

Plaintiff and Appellant,

v.

DEPARTMENT OF WATER RESOURCES,

Defendant and Respondent;

STATE WATER CONTRACTORS, INC., et al.,

Real Parties in Interest and Respondents.

COUNTY OF PLUMAS et al.,

Plaintiffs and Appellants,

v.

DEPARTMENT OF WATER RESOURCES,

Defendant and Respondent;

STATE WATER CONTRACTORS, INC., et al.,

Real Parties in Interest and Respondents.

S258574

Third Appellate District

C071785

Yolo County Superior Court

CVCV091258*

---

**\*** Two cases (Nos. 144282, 144283) were consolidated and transferred from the Butte County Superior Court to the Yolo County Superior Court (No. CVCV091258).

# ORDER MODIFYING OPINION

THE COURT:

The majority opinion in this case, filed on August 1, 2022, and appearing at __ Cal.5th __, is modified as follows:

The last full sentence on page 13 of the filed opinion, beginning "The document must include", is modified to read:

> The document must include a description of the proposed project and its environmental setting and discussions of (1) the possible environmental effects of the project, (2) feasible measures to mitigate any significant, adverse environmental effects of the project, (3) the comparative environmental effects of a range of reasonable alternatives to the proposed project, including a "no project" alternative, and (4) the cumulative impact of the project's various environmental effects. (CEQA Guidelines, §§ 15124, 15126, 15126.4, 15126.6, 15130.)  An EIR may also include a discussion of the economic and social effects of the project.  (*Id.*, § 15131.)

This modification does not affect the judgment.

# IN THE SUPREME COURT OF CALIFORNIA

COUNTY OF BUTTE,
Plaintiff and Appellant,

v.

DEPARTMENT OF WATER RESOURCES,
Defendant and Respondent;
STATE WATER CONTRACTORS, INC., et al.,
Real Parties in Interest and Respondents.

COUNTY OF PLUMAS et al.,
Plaintiffs and Appellants,

v.

DEPARTMENT OF WATER RESOURCES,
Defendant and Respondent;
STATE WATER CONTRACTORS, INC., et al.,
Real Parties in Interest and Respondents.

S258574

Third Appellate District
C071785

Yolo County Superior Court
CVCV091258\*

---

\*    Two cases (Nos. 144282, 144283) were consolidated and transferred from the Butte County Superior Court to the Yolo County Superior Court (No. CVCV091258).

August 1, 2022 (unmodified version)

Justice Liu authored the opinion of the Court, in which
Justices Kruger, Groban, Jenkins, and Guerrero concurred.

Chief Justice Cantil-Sakauye filed a concurring and dissenting
opinion, in which Justice Corrigan concurred.

COUNTY OF BUTTE v. DEPARTMENT
OF WATER RESOURCES

S258574


Opinion of the Court by Liu, J.


Operation of a dam, reservoir, or hydroelectric power plant requires a license from the Federal Energy Regulatory Commission (FERC). (16 U.S.C. § 817(1).) For decades, California has required public entities seeking licensing of state-owned and state-operated hydroelectric projects to conduct environmental review under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). In this case, California's Department of Water Resources (DWR or Department) prepared an environmental impact report (EIR) under CEQA in connection with its application for renewal of its 50-year license to operate the "Oroville Facilities," an interrelated group of public works operated by DWR in Butte County. Butte and Plumas Counties (the Counties) filed writ petitions challenging the sufficiency of the EIR.

The trial court found the Department's EIR adequate, and the Counties appealed. The Court of Appeal did not reach the merits of the Counties' CEQA claims, instead finding their actions in part preempted by the Federal Power Act (FPA; 16 U.S.C. § 791a et seq.) and otherwise premature. In 2019, we granted the Counties' petitions for review and transferred the matter to the Court of Appeal with directions to reconsider its decision in light of *Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677 (*Eel River*). On remand, the Court of Appeal again found the Counties' actions in part

1

preempted and otherwise premature. (*County of Butte v. Dept. of Water Resources* (Sept. 5, 2019) C071785, opn. ordered nonpub. Dec. 11, 2019, S258574 (*County of Butte*).)

The Court of Appeal held that the FPA preempts the Counties' challenge to the environmental sufficiency of the settlement agreement DWR prepared as part of FERC proceedings. We agree that the Counties' claims are preempted to the extent they attempt to unwind the terms of the settlement agreement reached through a carefully established federal process and seek to enjoin DWR from operating the Oroville Facilities under the proposed license. As the Court of Appeal recognized, FERC has sole jurisdiction over disputes concerning the licensing process employed here (*County of Butte, supra*, C071785; see 18 C.F.R. § 4.34(i)(6)(vii)), and the requested injunction would be akin to the "veto power" prohibited by *First Iowa Coop. v. Federal Power Comm'n* (1946) 328 U.S. 152, 164 (*First Iowa*).

But the Counties' writ petitions also challenged the sufficiency of the EIR more generally, and they have now abandoned their requests to enjoin the operation of the Oroville Facilities under the proposed license. In this court, the parties have fully briefed and asked us to decide whether the FPA preempts what remains of the Counties' CEQA claims. On this question, we observe that DWR relied on the EIR to analyze the environmental impact of operating the Oroville Facilities under the settlement agreement or an alternative proposed by FERC staff. The EIR serves as the informational source for DWR's decisionmaking as to whether to request particular terms from FERC as it contemplates the license (18 C.F.R. § 4.35(b) (2022)) or to seek reconsideration of terms once FERC issues the license (*id.*, § 4.200(b) (2022); 16 U.S.C. § 825*l*), avenues available to

any applicant under federal law. It also informs decisionmaking about potential measures that may be outside of or compatible with FERC's jurisdiction. Nothing in the FPA suggests Congress intended to interfere with the way the state as owner makes these or other decisions concerning matters outside FERC's jurisdiction or compatible with FERC's exclusive licensing authority. (See *Eel River, supra*, 3 Cal.5th at p. 724 [CEQA not categorically preempted where the federal scheme permits the state as owner to "make its decisions based on its own guidelines"]; *Wyeth v. Levine* (2009) 555 U.S. 555, 565 [congressional intent is the " 'ultimate touchstone in every preemption case' "].) Accordingly, we conclude that the Court of Appeal erred in finding the Counties' CEQA claims entirely preempted.

We affirm the decision of the Court of Appeal in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

The license governing DWR's operation of the Oroville Facilities (sometimes Facilities) was issued in 1957 and was set to expire in 2007. DWR began public preparations to apply for renewal of the license in October 1999. DWR has yet to achieve relicensing of the Facilities, and it currently operates the Facilities under annual, interim licenses. (See 18 C.F.R. § 16.18(b)(1) (2022).)

## A.

At the time DWR undertook the relicensing process, FERC regulations allowed applicants to pursue the traditional licensing process or an alternative. DWR chose to pursue the alternative licensing process (ALP), a voluntary procedure

designed to achieve consensus among interested parties on the terms of the FERC license before the licensing application is submitted. (18 C.F.R. §§ 4.34(i), 4.34(i)(2)(iv) (2022).) The ALP requires persons and entities with an interest in the operation of the project to cooperate in a series of hearings, consultations, and negotiations. (18 C.F.R. §§ 4.34(i)(3), (4) (2022).) The objective of the process is to identify areas of concern and disagreement among the stakeholders regarding the license terms and to resolve those differences. (18 C.F.R. §§ 4.34(i)(2)(ii), (iv), (v) (2022).) The ALP "[c]ombine[s] into a single process the pre-filing consultation process [of the traditional licensing procedure], the environmental review process under the National Environmental Policy Act[ of 1969 (42 U.S.C. § 4321 et seq.),] and administrative processes associated with the Clean Water Act [(33 U.S.C. § 1251 et seq.)] and other statutes." (18 C.F.R. § 4.34(i)(2)(i) (2022).) Ideally, ALP participants conclude the process by entering into a settlement agreement reflecting the terms of a proposed license. (*Id.*, subd. (i)(2)(v) (2022).) The settlement agreement then becomes the centerpiece of the license application and serves as the basis for FERC's "orderly and expeditious review" in setting the terms of the license. (*Ibid.*) Although FERC does not surrender its regulatory authority when it allows an applicant to pursue the ALP, the process permits the interested parties to prepare what is effectively a first draft of the license.

FERC approved DWR's request to use the ALP in January 2001, and the process consumed the next five years. The ALP participants included representatives from 39 organizations — five federal agencies, five state agencies, seven local government entities, five Native American tribes, four local water agencies, and 13 nongovernmental organizations. From late 2000

through 2004, the six working groups formed to conduct the ALP each met at least monthly, eventually logging an estimated 1,500 hours of meeting time.

During the early stages of the ALP, in September 2001, DWR issued a document combining a CEQA notice of preparation and a "scoping document." The latter plays a role under the National Environmental Policy Act (NEPA) that is similar to a notice of preparation under CEQA. (See 40 C.F.R. § 1501.9 (2022) [describing role of scoping]; Cal. Code Regs., tit. 14 (CEQA Guidelines), § 15082 [describing the notice of preparation and determination of scope of an EIR].) A primary purpose of the joint document was to solicit comment on the scope of a preliminary draft environmental assessment (PDEA) for the renewed license, a document whose preparation is mandated by the ALP. (18 C.F.R. § 4.34(i)(4)(iii) (2022).) The PDEA eventually prepared for the Facilities, issued in January 2005, is a 700-page analysis of the Facilities' proposed operation and likely environmental impact, including consideration of alternatives to the proposed project and mitigation measures. The PDEA's analysis was supported by an additional 1,500 pages of appendices.

After three years of hearings and consultations, the ALP participants began negotiating an agreement in April 2004. The 28-page settlement agreement (with 96 pages of attached appendices), concluded in March 2006, was signed by more than 50 parties. Butte and Plumas Counties, which participated in the ALP, were dissatisfied with the terms of the settlement and declined to sign the agreement. One appendix to the settlement agreement contains more than 40 pages of provisions governing the Facilities' operation that were intended by the parties to be included in the new FERC license. These provisions address

environmental protection, recreation, protection of cultural properties, flood control, land use, and expenditures. A second appendix added nearly 20 pages of further provisions that were not intended for inclusion in the new license, but which, as DWR told the trial court, DWR "nonetheless agreed to undertake to obtain consensus."

The settlement agreement and PDEA were submitted to FERC as DWR's application for a renewed license, with the first appendix serving as DWR's proposal for the terms of the new license. The settlement agreement stated that "[n]othing in this [a]greement is intended or shall be construed to be . . . a pre-decisional determination by a Public Agency. After the Effective Date of this Settlement Agreement but prior to the issuance of the New Project License, each Public Agency shall participate in the relicensing proceeding, including environmental review and consideration of public comments, as required by applicable law."

The relicensing process required FERC to comply with NEPA. Relying in part on the PDEA, FERC prepared a 500-page draft environmental impact statement (EIS), which issued in September 2006. As FERC explained, "In this draft [EIS], we assess the effects associated with the operation of the project as well as alternatives to the proposed project; make recommendations to [FERC's governing commission] about whether to issue a new license; and if so, recommend terms and conditions to become part of any license issued. . . . In addition to the power and developmental purposes for which licenses are issued (e.g., flood control, irrigation, and water supply), [FERC] must give equal consideration to the purposes of energy conservation; protection of, mitigation of damage to, and enhancement of fish and wildlife (including related spawning

grounds and habitat); protection of recreational opportunities; and the preservation of other aspects of environmental quality." In the draft EIS, FERC analyzed the environmental impact of three different alternatives: a "Proposed Action" that assumed the Facilities would operate under a new license incorporating the terms of the settlement agreement; a "No-action Alternative" that assumed continued operation under the existing license; and a "Staff Alternative" that assumed operation of the Facilities under a license based on the settlement agreement but containing modifications and additional provisions developed by FERC staff. The draft EIS concluded that the staff alternative was the "preferred alternative."

## B.

The Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), commonly known as the Clean Water Act, requires an applicant for a federal license to operate a facility that "may result in any discharge into the navigable waters" to obtain a certification from a state agency that the discharge will comply with state and federal water quality laws. (33 U.S.C. § 1341(a)(1).) Because there is no question that operation of the Facilities involves discharge into California rivers, DWR was required to obtain such a certificate from the State Water Resources Control Board (Water Board). DWR submitted its application for this certification in October 2005, a few months after the submission of its relicensing application to FERC.

Although, as noted, DWR issued a CEQA notice of preparation in 2001, it did not undertake further CEQA procedures, including the preparation of an EIR, until several years later, after its submission of the settlement agreement to

FERC. In May 2007, DWR issued a draft EIR analyzing the environmental impact of the same three alternatives considered in FERC's draft EIS. The EIR characterized the project under CEQA review as implementation of the settlement agreement, which would allow "the continued operation and maintenance of the Oroville Facilities for electric power generation." According to the EIR, DWR undertook CEQA procedures because (1) the Water Board required preparation and certification of an EIR as part of DWR's application for certification under the Clean Water Act and (2) the CEQA process could inform DWR's decision whether to accept the license containing the terms of either the settlement agreement or the alternative proposed by FERC staff, both of which were analyzed in the EIR.

After receiving and responding to public comment on the draft EIR, DWR finalized the EIR and issued a notice of determination in July 2008. The notice contained findings that the adoption of mitigation measures was required for approval of the project but that the project, so mitigated, would not have a significant effect on the environment. Consequently, "as conditions of project approval," DWR adopted a six-page slate of mitigation measures "that will be implemented by DWR" and a mitigation monitoring program to ensure that implementation.

The mitigation measures adopted by DWR addressed the Facilities' impacts on wildlife resources, botanical resources, noise, air quality, public health and safety, and geology, soils, and paleontological resources. In general terms, the mitigation measures require DWR to operate the Facilities and to conduct any construction activities associated with the Facilities in a safe and environmentally sensitive manner. The first measure, for example, requires DWR to "[m]inimize direct habitat loss or disturbance through project design and construction timing,"

using various specified measures. Other mitigation measures place similar constraints on the manner in which DWR can operate the Facilities. The mitigation monitoring program requires DWR to assign specialists to monitor mitigation activities, incorporate the mitigation measures into DWR's design and planning activities and its contracting, generate written documents reflecting the mitigation measures and their implementation, and certify the completion of actions taken to implement them. The EIR designated DWR as the agency "responsible for the implementation and management of the [mitigation monitoring program] and for ensuring that the procedures and measures described [in the EIR] are implemented."

During the CEQA review process, proceedings continued before the Water Board, which relied on the analyses in the Department's EIR and FERC's EIS to define the scope of the project and evaluate its environmental impact. In December 2010, the Water Board certified that the project considered in the EIR would comply with water quality requirements. The certification contained its own conditions, many of which overlapped with the requirements of the settlement agreement. By operation of law, these conditions must be included as terms of any new FERC license. (33 U.S.C. § 1341(d).)

The appellate record contains no information about FERC proceedings following DWR's certification of the final EIR, but the parties inform us that FERC has yet to take final action on DWR's application for a renewed license.

## C.

In August 2008, following DWR's certification of the EIR, Butte County and Plumas County filed separate petitions for

writ of mandate challenging DWR's compliance with CEQA in connection with the relicensing. The Plumas County lawsuit also includes as a petitioner the Plumas County Flood Control and Water Conservation District, a special law district that receives water from the Facilities. We refer to the County and the District jointly as "Plumas County." Butte County's claims challenged the EIR's analysis of the environmental impact of the project, as well as the project definition, assessment of alternatives, and adoption of mitigation measures with respect to government services and socioeconomic effects, recreation, water resources and quality, and climate change. Its petition sought an order setting aside DWR's certification of the EIR and enjoining "DWR's project," as well as any "such further relief that the Court deems just." Plumas County's petition raised similar claims and sought similar relief, including an order requiring the Facilities to "suspend all activity under the [EIR] certification that could result in any change or alteration in the physical environment" until certification of an adequate EIR and "other equitable or legal relief that the Court considers just and proper."

The parties stipulated to consolidation of the two petitions. In May 2012, the trial court issued a statement of decision rejecting the Counties' claims and finding the EIR adequate, and the Counties appealed. The Court of Appeal requested supplemental briefing to address whether the FPA preempted the Counties' actions. It subsequently held that the Counties' actions were preempted to the extent they challenged the settlement agreement, challenges over which FERC has exclusive jurisdiction, and premature to the extent they challenged the Water Board's certification, which had not issued at the time the Counties filed their actions. We granted the

Counties' petitions for review and transferred the matter to the Court of Appeal to reconsider its decision in light of *Eel River*, *supra*, 3 Cal.5th 677. The Court of Appeal reached the same conclusions on remand.

We granted review of this second decision to address two issues: (1) whether the FPA preempts application of CEQA when the state is acting on its own behalf and exercising its discretion in pursuing relicensing of a hydroelectric dam, and (2) whether the FPA preempts challenges in state court to an EIR prepared under CEQA to comply with section 401 (33 U.S.C. § 1341) of the Clean Water Act. Upon review of the appellate record and the parties' briefs, we conclude that the second issue is not properly presented, and we decline to address it.

## II.

We describe here the interrelated federal and state statutory schemes at play in this case.

## A.

The FPA, the original predecessor of which was enacted in 1920, was created to facilitate development of the nation's hydropower resources, in part by removing state-imposed roadblocks to such development. (*First Iowa*, *supra*, 328 U.S. at p. 174 ["Congress was concerned with overcoming the danger of divided authority so as to bring about the needed development of water power"].) "[The FPA] was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so . . . ." (*Id.* at p. 180.)

Under the FPA, the construction and operation of a dam or hydroelectric power plant requires a license from FERC. (16 U.S.C. §§ 797(e) [authorizing license issuance], 817(1) [unlawful to operate a hydropower plant without a FERC license].) Operation of a licensed facility is "conditioned upon acceptance by the licensee of all the terms and conditions of [the FPA] and such further conditions, if any, as [FERC] shall prescribe," which must be stated in the license. (16 U.S.C. § 799.) A FERC license must provide for, among other things, "the adequate protection, mitigation, and enhancement of fish and wildlife . . . , and for other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes." (16 U.S.C. § 803(a)(1); see *id.*, § 803(j).) To achieve this and other objectives of the FPA, FERC is granted express authority "to require the modification of any project and of the plans and specifications of the project works before approval." (16 U.S.C. § 803(a)(1).)

## B.

"CEQA embodies a central state policy to require state and local governmental entities to perform their duties 'so that major consideration is given to preventing environmental damage.' [Citations.] [¶] CEQA prescribes how governmental decisions will be made when public entities, including the state itself, are charged with approving, funding — or themselves undertaking — a project with significant effects on the environment." (*Eel River, supra*, 3 Cal.5th at pp. 711–712, italics omitted.) CEQA applies to any discretionary "project," defined as an activity that may cause a physical change in the environment and that is undertaken or financed by a public agency or requires a public agency's approval. (Pub. Resources Code, §§ 21065, 21080; see *id.*, § 21001.1 [projects proposed by

public agencies are subject to the same level of review as private projects].) If, after performing an initial study, the agency responsible for CEQA compliance, referred to as the "lead agency," finds substantial evidence that a project may have a significant environmental impact, the agency must prepare and certify an EIR before approving or proceeding with the project. (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1187; Pub. Resources Code, § 21100, subd. (a).)

The EIR is often referred to as the " ' "heart" ' " of CEQA. (E.g., *Eel River*, *supra*, 3 Cal.5th at p. 713.) "Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564.) Ideally, an EIR serves "to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided." (Pub. Resources Code, § 21002.1, subd. (a).) The document must include a description of the proposed project and its environmental setting and discussions of (1) the possible environmental effects of the project, (2) feasible measures to mitigate any significant, adverse environmental effects of the project, (3) the comparative environmental effects of a range of reasonable alternatives to the proposed project, including a "no project" alternative, (4) the cumulative impact of the project's various environmental effects, and (5) the economic and social effects of the project. (CEQA Guidelines, §§ 15124, 15126, 15126.4, 15126.6, 15131.) Given the role it plays and its required analysis, the EIR is commonly referred to as an "informational document." (Pub. Resources Code, § 21061;

CEQA Guidelines, § 15121.) It serves to inform decision makers and the general public about the nature and environmental impact of a proposed project, feasible ways to reduce that impact (often through the mechanism of mitigation measures), and possible alternatives to the project. (Pub. Resources Code, § 21061.)

Mitigation measures are modifications of the proposed design and implementation of a project imposed by the lead agency to reduce the project's adverse environmental effects. If an EIR identifies significant environmental effects, CEQA requires the adoption of mitigation measures when "it is feasible to do so." (Pub. Resources Code, § 21002.1, subd. (b).) CEQA recognizes that "economic, social, or other conditions [may] make it infeasible to mitigate one or more significant effects on the environment" and that in those circumstances "the project may nonetheless be carried out or approved at the discretion of a public agency if the project is otherwise permissible under applicable laws and regulations." (Pub. Resources Code, § 21002.1, subd. (c); see CEQA Guidelines, § 15364 [" 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors"].) To move forward with the project, the lead agency must find that "specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." (Pub. Resources Code, § 21081, subd. (b).)

When the project is publicly financed or undertaken, as here, feasible mitigation measures must be incorporated into the plan or project design. (CEQA Guidelines, § 15126.4, subd. (a)(2); see also Pub. Resources Code, § 21081.6, subd. (b).)

Further, to "ensure that the mitigation measures and project revisions identified in the EIR . . . are implemented," the lead agency, when approving the EIR, must also adopt "a program for monitoring or reporting on the revisions which it has required in the project and the measures it has imposed to mitigate or avoid significant environmental effects." (CEQA Guidelines, § 15097, subd. (a); see also Pub. Resources Code, § 21081.6, subd. (a)(1).) In this way, CEQA's mitigation measures play a crucial role in reducing the environmental impact of projects undertaken in California.

## III.

"The Supremacy Clause provides that 'the Laws of the United States' (as well as treaties and the Constitution itself) 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.' [U.S. Const.] Art. VI, cl. 2. Congress may consequently pre-empt, *i.e.*, invalidate, a state law through federal legislation. It may do so through express language in a statute. But even where . . . a statute does not refer expressly to pre-emption, Congress may implicitly pre-empt a state law, rule, or other state action." (*Oneok, Inc. v. Learjet, Inc.* (2015) 575 U.S. 373, 376–377 (*Oneok*).)

There are "three different types of preemption — 'conflict,' 'express,' and 'field,' [citation] — but all of them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." (*Murphy v. National Collegiate Athletic Assn.* (2018) 584 U.S. __, __ [138 S.Ct. 1461, 1480] (*Murphy*).)

Conflict preemption "exists where 'compliance with both state and federal law is impossible,' or where 'the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' " (*Oneok*, *supra*, 575 U.S. at p. 377.) "[T]he threshold for establishing" such an obstacle "is demanding: 'It requires proof Congress had particular purposes and objectives in mind[ and] a demonstration that leaving state law in place would compromise those objectives . . . .' " (*People v. Rinehart* (2016) 1 Cal.5th 652, 661; see *Chamber of Commerce of the United States of America v. Whiting* (2011) 563 U.S. 582, 607 (plur. opn. of Roberts, C. J.) [a " 'high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act' "].) " '[P]re-emption analysis is not "[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" ' " (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 939), but a focused inquiry into "whether there exists an irreconcilable conflict between the federal and state regulatory schemes" (*Rice v. Norman Williams Co.* (1982) 458 U.S. 654, 659). "The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." (*Ibid.*)

Further, when it comes to considering preemption of state-owned or state-operated projects, we apply a presumption that "protects against undue federal incursions into the internal, sovereign concerns of the states." (*Eel River*, *supra*, 3 Cal.5th at p. 705, citing *Gregory v. Ashcroft* (1991) 501 U.S. 452 and *Nixon v. Missouri Municipal League* (2004) 541 U.S. 125; see also *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 518.) "To determine the reach of the federal law preempting state regulation of a state-owned [project] we must consider a

presumption that, in the absence of unmistakably clear language, Congress does not intend to deprive the state of sovereignty over its own subdivisions to the point of upsetting the usual constitutional balance of state and federal powers." (*Eel River*, at p. 690.) And there is a "related presumption" that "Congress does not intend to reach and preempt a state's proprietary arrangements in the marketplace in the absence of evidence of such an expansive congressional intent." (*Id.* at p. 705.)

### A.

Respondent State Water Contractors, Inc., an association of public water agencies, is the only party asserting that the Counties' claims are fully preempted. It argues that the FPA contains the requisite "unmistakably clear" indication of congressional intent to occupy the field and preempt the Counties' challenges. If the issue before us involved state regulation of private entities, these arguments may have prevailed. Although the FPA does not contain an express preemption clause, the high court recognized 70 years ago in *First Iowa* that "the FPA establishes a broad and paramount federal regulatory role." (*California v. FERC* (1990) 495 U.S. 490, 499.) "That broad delegation of power . . . , however, hardly determines the extent to which Congress intended to have the Federal Government exercise exclusive powers, or intended to pre-empt concurrent state regulation of matters affecting federally licensed hydroelectric projects." (*Id.* at pp. 496–497.)

In two decisions, *First Iowa* and *California v. FERC*, the high court determined that state regulatory efforts that conflicted with the exclusive federal licensing authority granted by the FPA were preempted. *First Iowa* concerned the state's

attempt to require an applicant for a federal license to secure a state permit for a privately operated project that would regulate "the very requirements of the project that Congress has placed in the discretion" of the federal agency. (*First Iowa*, *supra*, 328 U.S. at p. 165.) *California v. FERC* similarly involved "overlapping federal and state regulation." (*California v. FERC*, *supra*, 495 U.S. at p. 493.) In that case, the high court rejected an attempt by the state to mandate minimum stream flow requirements on a private project that were higher than federal flow requirements. Both decisions interpreted the FPA to leave "the permit requirements at issue to the federal sphere." (*Id.* at p. 503.)

*First Iowa* and *California v. FERC* could be read to apply either conflict or field preemption. (See *First Iowa*, *supra*, 328 U.S. at pp. 167, 171, 178, 180–181; *California v. FERC*, *supra*, 495 U.S. at pp. 493, 496–497, 505, 506; cf. *California Oregon Power Co. v. Superior Court of Cal.* (1955) 45 Cal.2d 858, 868 ["Implicit in [*First Iowa*] is the concept that the field is not exclusively occupied for all purposes by the [FPA] or [FERC's predecessor]"].) As the Ninth Circuit noted in *Sayles Hydro Assn. v. Maughan* (9th Cir. 1993) 985 F.2d 451 (*Sayles Hydro*), "[t]he dichotomy between the two types of preemption is not so sharp in practical terms as the legal characterization makes it appear, so the mixed language has little significance." (*Id.* at p. 456; see *Murphy*, *supra*, 584 U.S. at p. __ [138 S.Ct. at p. 1480] ["field preemption[,] . . . like all other forms of preemption, . . . concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law"].) *Sayles Hydro* ultimately applied field preemption in a case that, similar to *First Iowa* and *California v. FERC*, involved the licensing of a private entity.

None of these cases considered whether Congress intended to occupy the field to the extent of precluding a state from exercising authority over its own subdivision's license application. Field preemption requires not only a determination that Congress intended to occupy the field, but consideration of what the "boundaries of the pre-empted field" are. (*English v. Gen. Electric Co.* (1990) 496 U.S. 72, 82 (*English*).) *First Iowa*, *California v. FERC*, and *Sayles Hydro* each involved state regulation of private parties rather than the type of self-government we discussed in *Eel River*, which is also at issue here. (See *Eel River*, *supra*, 3 Cal.5th at p. 723 ["CEQA embodies a state policy adopted by the Legislature to govern how the state itself and the state's own subdivisions will exercise their responsibilities."].) None of those cases defined the field to include the state's prerogative to govern the work of its own agency in a manner that does not conflict with federal law. (See, e.g., *First Iowa*, *supra*, 328 U.S. at p. 171 ["The [FPA] leaves to the states their traditional jurisdiction"].)

The concurring and dissenting opinion relies on the FPA's savings clause, 16 United States Code section 821 (commonly referred to as section 27), in concluding that Congress intended to occupy the field to preclude CEQA's application here. Section 27 states: "Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." (16 U.S.C. § 821.) Notably, the statute does not say that these matters are the only matters reserved. (See *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.* (2d Cir. 2012) 673 F.3d 84, 97 (*Niagara Mohawk Power*

*Corp.*) ["just because the savings clause fails to mention certain state-law powers does not mean that all unmentioned powers are federally preempted"].)  In *Eel River*, we found an explicit and broad preemption clause insufficiently clear to overcome the presumption that Congress did not intend to preempt a state's internal decisionmaking under CEQA, even if it intended to preempt the state's regulation of private parties in the same context.  (*Eel River*, *supra*, 3 Cal.5th at p. 723.)  The language of section 27, a savings clause, does not support a different preemption conclusion here.

Our concurring and dissenting colleagues also rely on judicial interpretations of section 27 in *First Iowa*, *California v. FERC*, and *Sayles Hydro*.  But none of these decisions is probative of congressional intent on the issue before us, nor do any address whether section 27 evinces an "unmistakably clear" (*Eel River, supra*, 3 Cal.5th at p. 690) intent by Congress to preempt a state's environmental review of its own project as opposed to its regulation of a private entity.  The concurring and dissenting opinion does not explain how any of these cases supports defining the preempted field to include the specific conduct at issue today.  We must determine whether Congress intended to preclude "the state [from] trying to govern *itself — to engage in* 'decision[s] of the most fundamental sort for a sovereign entity.'"  (*Id.* at p. 729; see, e.g., *English, supra*, 496 U.S. at p. 82; *Pacific Gas & Elec. v. Energy Resources Comm'n* (1983) 461 U.S. 190, 205; *Niagara Mohawk Power Corp., supra*, 673 F.3d at pp. 95–96.)  Reliance on these opinions in the absence of evidence that Congress intended to reach this far is contrary to the "strong presumption against preemption" that applies "to the *existence* as well as the *scope* of preemption." (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1088, citing

*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485; see *Eel River*, at p. 729 ["Without plainer language to that effect, we do not believe Congress intended to displace the exercise of a state's ordinary power of self-governance when the state does not propose to act in contravention of the dictates" of federal law].)

The concurring and dissenting opinion contends that Congress has accepted these interpretations of section 27 and by so doing "has made unmistakably clear the broad preemptive reach it intends for [the] FPA." (Conc. & dis. opn., *post*, at p. 29.) But "[a]rguments based on supposed legislative acquiescence rarely do much to persuade." (*Scher v. Burke* (2017) 3 Cal.5th 136, 147; see *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1395–1396.) And they do nothing at all when premised on acquiescence to judicial opinions that do not concern the same subject matter. (*Scher*, at p. 147.) To the extent legislative acquiescence is relevant at all, it is notable that the concurring and dissenting opinion places no weight on the Counties' claim that "[f]or decades, CEQA review for such projects has coexisted with federal regulation without FERC [or Congress] ever suggesting that CEQA is preempted." (See conc. & dis. opn., *post*, at p. 22, fn. 8.)

Neither the FPA's legislative history nor its language suggests that Congress intended this to be one of the "rare cases" where it has " 'legislated so comprehensively' . . . that it 'le[aves] no room for supplementary state legislation' " of the type at issue here concerning how a state entity conducts its own decisionmaking. (*Kansas v. Garcia* (2020) 589 U.S. __, __ [140 S.Ct. 791, 804]; see *First Iowa, supra*, 328 U.S. at p. 171 [the FPA, when "read in the light of its long and colorful legislative history, . . . discloses both a vigorous determination of Congress to make progress with the development of . . . water power . . .

and a determination to avoid unconstitutional invasion of the jurisdiction of the states"].) This does not appear to be "an area the Federal Government has reserved for itself," which is "the basic premise of field preemption." (*Arizona v. United States* (2012) 567 U.S. 387, 402.)

As DWR states in its briefing, "[t]he fact that the [FPA] has a significant preemptive sweep says nothing about congressional intent to prohibit state action that is non-regulatory." When the state or a subdivision proposes to develop its own property, CEQA "operates as a form of self-government . . . . Application of CEQA to the public entity charged with developing state property is not classic *regulatory* behavior, especially when there is no encroachment on the regulatory domain of the [federal authority] or inconsistency with [federal law] . . . . Rather, application of CEQA in this context constitutes self-governance on the part of a sovereign state and at the same time on the part of an owner." (*Eel River*, *supra*, 3 Cal.5th at p. 723.)

State Water Contractors argues that the reasoning of *Eel River* is inapt because the federal scheme at issue in that case deregulated the industry while the federal legislation here requires every dam and hydroelectric power plant to obtain a federal license to operate and grants FERC the exclusive right to issue such licenses. (See also conc. & dis. opn., *post*, at p. 26.) But our reasoning in *Eel River* did not hinge on the industry's deregulation; rather, it was based on what the federal scheme permitted the state as owner to do as a result of that deregulation — namely, make its own choices about its project, guided by an EIR. (*Eel River*, *supra*, 3 Cal.5th at p. 724.) There is "no indication in the language of the [FPA] that Congress intended to preempt [state] self-governance" when it is carried

out by means of a state law permitting challenges to a state agency's EIR.  (*Id.* at p. 704; see *id.* at p. 730 ["The availability of citizen enforcement mechanisms does not change our view that CEQA operates as a system of self-governance . . . in this case"].)  Without more, we cannot conclude that "Congress . . . intended 'to foreclose any state [activity] in the area,' irrespective of whether state law is consistent or inconsistent with 'federal standards.' "  (*Oneok, supra*, 575 U.S. at p. 377, italics omitted.)

**B.**

At the same time, the fact that CEQA is not categorically preempted does not mean that no CEQA applications or remedies are preempted by the federal scheme.  (*Eel River, supra*, 3 Cal.5th at p. 740; *id.* at pp. 740–741 (conc. opn. of Kruger, J.).)  To the contrary, the Counties made clear during oral argument that they are no longer seeking injunctive relief that would interfere with the federal licensing process, conceding preemption on this issue, and all parties agree that no state court can issue a remedy that conflicts with federal law.  In this respect, the Counties now appear to acknowledge that the Court of Appeal was correct in holding that they cannot, in this CEQA action, challenge the terms of the settlement agreement reached through the ALP.

We agree.  The overriding purpose of the FPA is to facilitate the development of the nation's hydropower resources.  (*First Iowa, supra*, 328 U.S. at pp. 174, 180.)  A primary tool in achieving that goal was to centralize regulatory authority in the federal government in order to remove any obstacles to such development posed by state regulation.  (*Ibid*.)  A CEQA challenge to the terms of a settlement agreement reached

through the ALP would raise preemption concerns to the extent the action would interfere with the federal process detailed above or with FERC's jurisdiction over the proceedings. (See 18 C.F.R. § 4.34(i)(6)(vii) (2022); *International Paper Co. v. Ouellette* (1987) 479 U.S. 481, 494 ["A state law . . . is preempted if it interferes with the methods by which the federal statute was designed to reach [its] goal"].) A state court order granting the injunctive relief the Counties initially sought would stand as a direct obstacle to the accomplishment of Congress's objective of vesting exclusive licensing authority in FERC. (See *California v. FERC, supra,* 495 U.S. at pp. 506–507.)

If that were all the Counties had requested, we would affirm the judgment below directing the trial court to dismiss the action in its entirety. But the Counties' writ petitions challenge the Department's EIR more broadly. Beyond seeking to enjoin DWR's project, the Counties also requested a writ of mandate setting aside the certification of the EIR as adequate and whatever "further relief . . . the Court deems just."

State Water Contractors defends the Court of Appeal's complete dismissal on the sole ground that all of the Counties' CEQA claims are preempted. As discussed, the Court of Appeal was correct to hold that the Counties' challenge to the environmental sufficiency of the settlement agreement was preempted. But the Counties not only sought an injunction against DWR's operation of the Facilities under the terms of the settlement agreement. They also challenged the environmental sufficiency of the EIR itself, which they claim DWR can use in connection with its decisionmaking about the licensing process and the operation of the Facilities without interfering with FERC's authority.

24

The EIR characterized the project under CEQA review as implementation of the settlement agreement and analyzed the environmental impact of the settlement agreement as well as the FERC staff alternative. At this stage in the proceedings, review of the Department's EIR does not interfere with FERC's jurisdiction or exclusive licensing authority. Federal law expressly allows applicants (public or private) to amend their license application or seek reconsideration once FERC has issued a license. (See 18 C.F.R. § 4.35(b) (2022) [application may be amended pending review]; *id.*, § 385.713 (2022) [authorizing request for rehearing]; 18 C.F.R. § 4.200(b) (2022) [allowing application to amend license after issuance]; 16 U.S.C. § 825*l* [authorizing rehearing application and judicial review].) And we are aware of no federal law — and the concurring and dissenting opinion cites none — that limits an applicant's ability to analyze its options or the proposed terms of the license before doing so. That is, DWR can undertake CEQA review, including permitting challenges to the EIR it prepares as part of that review, in order to assess its options going forward. Nothing about such use of CEQA review is incompatible with federal authority. (See *Eel River*, *supra*, 3 Cal.5th at p. 724 [where federal law does not otherwise require, "the state as owner may make its decisions based on its own guidelines rather than some anarchic absence of rules of decision"].) These activities are a far cry from the conflicting state regulations imposed on private actors at issue in *First Iowa* and *California v. FERC*.

DWR's decision document recognized that "[a]pproval of the Proposed Project . . . will not lead to immediate implementation of the [settlement agreement (SA)] articles. DWR's implementation of the SA actions that are within FERC's jurisdiction depend[s] on FERC issuing and DWR accepting a

license materially consistent with the Proposed Project." It also noted that if the license FERC issues involves "terms and conditions not included in the Proposed Project or FERC Staff Alternative," additional CEQA review will be required by DWR. The Department's EIR is programmatic in nature, meaning it contemplates additional CEQA review in connection with later activities that are part of the project. (See CEQA Guidelines, §§ 15168, 15152.) There is no indication Congress "believe[d] that it was inconsistent to vest [FERC] with exclusive regulatory authority . . . while at the same time allowing" applicants to analyze ongoing environmental considerations, request certain terms, or seek reconsideration of the terms of any license offered within the means federal law supplies. (*Silkwood v. Kerr-McGee Corp* (1984) 464 U.S. 238, 258.)

State Water Contractors takes issue with the Counties' desire to see particular mitigation measures imposed on the project. But any preemption concerns related to DWR's ability to adopt additional mitigation measures in the EIR, if warranted, are premature. At this stage, the Counties challenge only the sufficiency of the EIR, and they contend the EIR can inform DWR's decisionmaking in ways that do not conflict with FERC's authority. They do not ask the court to impose or enforce any CEQA mitigation measures, much less any that are contrary to federal authority. A CEQA challenge to the Department's EIR is not inherently impermissible, nor is it clear that any mitigation measures will conflict with the terms of the license ultimately issued by FERC. As noted, an EIR may contain mitigation measures that fall outside of FERC's jurisdiction or are compatible with FERC's exclusive licensing authority. Meanwhile, federal law provides avenues for any mitigation measures identified by the Department's CEQA

review that fall under FERC's jurisdiction to be incorporated into the eventual license if FERC so decides. If they are incorporated, then it is no obstacle to FERC's authority that they originated with the state as applicant. If they are not, then FERC has simply exercised its discretion to dictate the terms of the license offered, preempting any particular applications or enforcement mechanisms of CEQA that conflict with that authority. (See *Eel River, supra,* 3 Cal.5th at p. 740; *id.* at pp. 740–741 (conc. opn. of Kruger, J.).) In either case, CEQA can inform the public entity's decisionmaking without encroaching on FERC's ultimate licensing authority.

The concurring and dissenting opinion mistakes today's inquiry and our holding at several turns. We do not consider *Eel River*'s rationale to be inapplicable here, nor do we understand *Eel River* to have found CEQA "*exempt* from preemption" by the federal statute at issue in that case. (Conc. & dis. opn., *post,* at p. 24; see *id.* at p. 26.) In *Eel River,* we conducted traditional preemption analysis to determine that the state's use of CEQA in particular circumstances was not preempted, while carefully delineating the circumstances in which it was preempted. Today's opinion likewise does not conclude that DWR's actions are "not subject to" the usual analysis for field preemption and purposes and objectives preemption. (Conc. & dis. opn., *post,* at p. 33.) Instead, we find that State Water Contractors has not carried its burden to establish field preemption here. And in determining " 'whether, under the circumstances of this particular case, [CEQA] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' " (*Jones v. Rath Packing Co.* (1997) 430 U.S. 519, 526), we find the Counties' claims preempted in part. Although the concurring and dissenting opinion considers

27

today's ruling to go "beyond the holding of" *Eel River* (conc. & dis. opn., *post*, at p. 33; see *id.* at pp. 30–31), *Eel River* itself considered certain applications of CEQA preempted (*Eel River*, at pp. 739–740) and took no issue with the observation that "particular CEQA remedies might be preempted" on remand (*id.* at p. 741 (conc. opn. of Kruger, J.)). We do the same here.

The concurring and dissenting opinion's concerns about the workability of today's holding are misplaced. In contending that there is or will be conflict between our decision and federal case law, our colleagues overlook the distinction between state regulation of private parties and the state's self-governance at issue here. We are not aware of any authority contrary to our holding today. As noted, *Sayles Hydro* involved state regulation of a private party, and *Eel River* did not involve the FPA. The closest case that our concurring and dissenting colleagues can find is a New York appellate court decision that applied field preemption, based on two sentences of analysis, to an issue we do not address here. (Conc. & dis. opn., *post*, at p. 22, fn. 8.)

Further, the concurring and dissenting opinion says this lawsuit has resulted in years of delay to FERC's issuance of the license. (Conc. & dis. opn., *post*, at pp. 3, fn. 1, 38.) But this assertion is mere conjecture. No party has argued that the delay in obtaining a license from FERC is attributable to the Counties' litigation, and there is no evidence in the record to that effect. There are more than a dozen relicensing applications other than this one that were filed prior to 2010, when the section 401 certification issued in this project, that are still pending before FERC. (See FERC, Licensing: Pending License, Relicense, and Exemption Applications, updated 7/15/2022, available at <https://www.ferc.gov/licensing> [as of Jul. 28, 2022]; all Internet citations in this opinion are archived by year, docket

number, and case name at
<http://www.courts.ca.gov/38324.htm>.) And a cursory
inspection of FERC's docket reveals numerous requests for
delays in the proceedings unrelated to this litigation. Moreover,
even if the delay were attributable solely to the litigation, there
is little reason to assume any future litigation will be as
prolonged. Today's opinion resolves the matter in dispute, and
a challenge to the environmental sufficiency of the Department's
EIR need not delay issuance of FERC's license in these
circumstances.

The concurring and dissenting opinion says our holding
will have little practical impact. As an initial matter, the
question of the sufficiency of the EIR or the merits of the
Counties' claims is not before us. But even if the Counties'
lawsuit is not meritorious, that does not mean a finding of
preemption is warranted. Our colleagues repeatedly note the
fact that environmental review was conducted at earlier stages.
(Conc. & dis. opn., *post*, at pp. 4, 5, 34–36.) But it is incorrect to
suggest the Department's EIR is identical to those prior
inquiries when it involves matters that were not yet before them
or are beyond their scope. An EIR can play a role in DWR's
evaluation of matters outside of or compatible with FERC's
jurisdiction, and the concurring and dissenting opinion does not
identify any mitigation measures DWR has adopted that conflict
with FERC's authority. At this stage, any concerns about
conflicting mitigation measures are exaggerated or at least
premature.

In sum, we affirm the Court of Appeal's ruling that the
Counties "cannot challenge the environmental sufficiency of the
[settlement agreement]" (*County of Butte, supra*, C071785) or
seek to unwind it. To do so would pose an obstacle to FERC's

congressionally granted exclusive authority on those matters. But the same is not the case for the Counties' challenge to the environmental sufficiency of the EIR more generally, insofar as a compliant EIR can still inform the state agency concerning actions that do not encroach on FERC's jurisdiction. Nothing clearly precludes our courts from considering a challenge to the sufficiency of the EIR in these circumstances and ordering, for example, DWR to reconsider its analysis if warranted. Accordingly, we reverse in part and remand for further consideration of the Counties' remaining claims, largely unaddressed by the Court of Appeal's decision, and for resolution of any open questions such as whether there are procedural or other bars to those claims.

## CONCLUSION

We affirm the judgment of the Court of Appeal in part, reverse in part, and remand for further proceedings consistent with this opinion.

**LIU, J.**

**We Concur:**

**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

COUNTY OF BUTTE v. DEPARTMENT
OF WATER RESOURCES

S258574


Concurring and Dissenting Opinion by Cantil-Sakauye, C. J.


I agree with my colleagues that the decision of the Department of Water Resources (DWR) to engage in review under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq) is subject to the dictates of the supremacy clause of the United States Constitution. (U.S. Const., art. VI, cl. 2.) My disagreement concerns the scope and consequences of that preemption.

CEQA is a powerful regulatory statute, requiring a lead agency to adopt tailored regulations, referred to as "mitigation measures," designed to reduce to insignificance any potentially significant adverse environmental effects of a project. The majority holds that the doctrine of preemption takes effect in this case only when these mitigation measures prove to be inconsistent with a license granted by the Federal Energy Regulatory Commission (FERC) or when a private action to enforce CEQA seeks to interfere with FERC licensing proceedings. Such limited preemption is an unavoidable concession to the most basic doctrine of implied preemption, which holds that "[w]here state and federal law 'directly conflict,' state law must give way." (*PLIVA, Inc. v. Mensing* (2011) 564 U.S. 604, 617.) If that were all the supremacy clause requires, I would have no quarrel with the majority's holding today.

1

The scope of preemption, however, is considerably broader. For one, Congress can choose to occupy a regulatory field entirely, thereby precluding all state regulation, regardless of its content. (See *Arizona v. United States* (2012) 567 U.S. 387, 401 ["Where Congress occupies an entire field, . . . even complementary state regulation is impermissible"].) Equally applicable is "purposes and objectives" preemption, a partner of the rule acknowledged by the majority: State legislation is preempted not only when it directly conflicts with federal law, but also when the state law " ' "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' " (*Oneok, Inc. v. Learjet, Inc.* (2015) 575 U.S. 373, 377 (*Oneok*).) CEQA is preempted here under either category.

The United States Supreme Court has consistently interpreted the Federal Power Act (FPA; 16 U.S.C. § 791a et seq.) to reflect Congress's intent to occupy the field of hydropower regulation, as the United States Court of Appeals for the Ninth Circuit recognized nearly 30 years ago. (*Sayles Hydro Assn. v. Maughan* (9th Cir. 1993) 985 F.2d 451, 454–455 (*Sayles Hydro*).) Through a savings clause, the FPA limits the states to a narrow band of regulation, and no one contends that CEQA falls within that band. Indeed, the Ninth Circuit found CEQA preempted in connection with FPA proceedings, although it did not identify the statute by name. (*Sayles Hydro*, at p. 455.)

In addition, CEQA stands as a clear obstacle to the Congressional objective of vesting exclusive control over hydropower licensing and regulation in FERC. The key to CEQA's success in limiting the environmental impact of regulated activities in California is its mitigation mandate. A CEQA lead agency *must*, in approving a project, adopt both a

slate of mitigation measures, which have the effect of law, and a mitigation monitoring program designed to ensure compliance with those mitigation measures. That regulatory tool, however, conflicts with the exclusive authority granted to FERC under the FPA. The mitigation measures required by CEQA, enforced by the equally compulsory mitigation monitoring program, create a competing state regulatory regime that stands as a direct obstacle to the accomplishment of the congressional purpose and objective of vesting unchallenged regulatory authority over hydropower in FERC.

Further, as this case glaringly demonstrates, the private enforcement provisions of CEQA stand as an inevitable impediment to the congressional purpose of granting to FERC exclusive control over the hydropower licensing process. FERC's licensing regulations were clearly designed to render unnecessary the application of state environmental review statutes. Imposing such state proceedings adds nothing to the licensing process, but it appears to have created, in this case, a delay of 12 years (and counting).[1]

Because these critical features of CEQA — the mandatory imposition of mitigation measures and the allowance for private enforcement — stand as an obstacle to the accomplishment of

_____

[1]     All of the regulatory pieces appear to have been in place for FERC to issue a new license in 2010, but no license has issued. The parties have not addressed the cause of the intervening 12-year delay, but no one has suggested there is a continuing legal barrier to license issuance. An obvious inference is that FERC decided to let the state proceedings play out before issuing a new license. And FERC is still waiting. The litigation is 14 years old, and the majority's remand will guarantee it another year of life, at a minimum.

congressional purposes and objectives, invocation of the CEQA statute is wholly preempted in these circumstances. On this basis, I would affirm the judgment of the Court of Appeal dismissing the consolidated actions brought by the County of Butte and the County of Plumas.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As the majority explains, this matter comes to us in the midst of a federal relicensing proceeding for the Oroville Facilities (Facilities), a collection of dams and hydropower projects operated by DWR in Butte County. (Maj. opn., *ante*, at pp. 3–7.) The unfinished relicensing proceeding is, at present, 22 years old.

FERC's alternative licensing process (ALP) is hardly insensitive to environmental concerns. At the outset, the ALP required DWR to prepare a preliminary draft environmental assessment (PDEA), an analysis of the likely environmental impact of Facilities operation. (18 C.F.R. § 4.34(i)(4)(iii) (2022).) As the majority notes, this was a 700-page document supported by 1,500 pages of appendices. (Maj. opn., *ante*, at p. 5.) In its content, the PDEA was materially indistinguishable from an environmental impact report (EIR), whose preparation is required by CEQA. Only after the preparation of this PDEA, DWR and the other 50-odd participants in the ALP convened to negotiate the terms of a proposed license for presentation to FERC. Inasmuch as the ALP participants included a wide variety of public agencies, managing the possible environmental effects of Facilities operations undoubtedly played an important role in the negotiations. In any event, no one contends that environmental concerns were given inadequate consideration during the ALP.

The ALP participants — with the exception of the present two counties — managed to agree on the terms of a proposed license, which DWR forwarded to FERC as its application for relicensing.  A FERC license must provide for, among other things, "the adequate protection, mitigation, and enhancement of fish and wildlife . . . , and for other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes." (16 U.S.C. § 803(a)(1); see *id.*, § 803(j).)  After time for study, FERC prepared its own formal environmental analysis, an environmental impact statement (EIS) prepared under the authority of the federal analog to CEQA, the National Environmental Policy Act of 1969 (NEPA; 42 U.S.C. § 4321 et seq.)  Again, the informational requirements for an EIS are not materially different from those for an EIR.[2] In the EIS, FERC outlined the additional terms it proposed to add to the license terms proposed in the settlement agreement and evaluated the environmental impact of these additional measures, as well as the impact of the settlement agreement's proposal.

At this point in the licensing process, two complete EIR equivalents had been prepared.  Yet DWR elected to prepare a third environmental analysis under the authority of CEQA, defining as its project the implementation of the settlement agreement, which it viewed as equivalent to "the continued operation and maintenance of the Oroville Facilities for electric

_____

[2]     Like an EIR, an EIS "must contain, among other things, a detailed discussion of 'the environmental impact of the proposed action,' 'adverse environmental effects which cannot be avoided,' 'alternatives to the proposed action,' and possible mitigation measures." (*Protect Our Cmtys. Found. v. Lacounte* (9th Cir. 2019) 939 F.3d 1029, 1035.)

power generation." Once triggered, however, CEQA required much more than the preparation of an EIR. As part of its CEQA compliance, DWR issued a notice of determination finding that the adoption of mitigation measures was required for approval of the project.[3] Consequently, "as conditions of project approval," DWR adopted a series of mitigation measures and a mitigation monitoring program to ensure that implementation. The mitigation measures largely overlapped with the environmental concerns of the settlement agreement and the anticipated FERC license. As the majority explains, they imposed constraints on future operation of the Facilities to minimize the project's environmental effects. (Maj. opn., *ante*, at pp. 8–9.)

Following DWR's certification of the EIR, Butte County and Plumas County filed petitions for a writ of mandate, contending that DWR's compliance with CEQA was deficient and seeking to stay the licensing proceedings. Although no court order halting the proceedings ever issued, the counties' petitions had the desired effect. All of the pieces appear to have been in place for FERC's issuance of a new license in 2010, but the federal agency has, to date, taken no action on DWR's application.

---

[3] The notice of determination's reference to project approval, of course, was approval under state law. Because FERC has exclusive authority over Facilities' operation, this approval had no practical significance beyond CEQA compliance.

## II. DISCUSSION

### A. Governing Law

#### 1. *Federal Power Act*

The construction and operation of a dam or hydroelectric power plant requires a license from FERC, which has broad discretion to require changes in the project design and impose conditions on project operation. (16 U.S.C. §§ 797(e), 799, 803(a)(1), 817(1).) This authority places the design and operation of hydroelectric power plants and related facilities squarely under FERC's comprehensive regulatory control.

#### 2. *California Environmental Quality Act*

"CEQA embodies a central state policy to require state and local governmental entities to perform their duties 'so that major consideration is given to preventing environmental damage.'" (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 711 (*Eel River*).) As discussed more fully by the majority (maj. opn., *ante*, at pp. 12–15), CEQA applies to discretionary public and private projects that may cause a change in the physical environment. (Pub. Resources Code, §§ 21065, 21080; see *id.*, § 21001.1.) Projects that may have a significant environmental impact require the preparation of an EIR (Pub. Resources Code, § 21100, subd. (a)), which must discuss the possible environmental effects of the project, measures to mitigate those effects, and possible alternatives to the project. (CEQA Guidelines, §§ 15124, 15126, 15126.4, 15126.6, 15131.)[4]

---

[4] CEQA is implemented by an extensive series of administrative regulations promulgated by the Secretary of the

An EIR provides decision makers with copious information about the potential impact of a proposed project, but the CEQA process is not solely informational. It also plays a critical *regulatory* role, largely through the mechanism of mitigation measures, which are conditions placed on the design and operation of a project to reduce the project's adverse environmental effects. CEQA *mandates* their imposition, when feasible, if significant environmental effects are identified in an EIR. As CEQA declares in its opening provisions, "the procedures *required* by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." (Pub. Resources Code, § 21002, italics added.) "Each public agency *shall* mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so." (*Id.*, § 21002.1, subd. (b), italics added.) To serve this end, an EIR is required to "identify mitigation measures for each significant environmental effect identified in the EIR." (CEQA Guidelines, § 15126.4, subd. (a)(1)(A).)

Once identified in an EIR, the feasible mitigation measures must be adopted by the lead agency as legally enforceable features or conditions of the project. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 524–525 [agencies are

Natural Resources Agency, codified at title 14, division 6, chapter 3 of the California Code of Regulations, which I will refer to as the "CEQA Guidelines." Courts must "afford great weight" to them when interpreting CEQA. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2.)

required "to implement all mitigation measures unless those measures are truly infeasible"].) CEQA expressly forbids a lead agency from approving or carrying out a project unless "[c]hanges or alterations have been required in, or incorporated into, the project which mitigate or avoid" any significant effects on the environment identified in the EIR.[5] (Pub. Resources Code, § 21081, subd. (a)(1).) When the project under consideration is a private project, the mitigation measures must be made "fully enforceable" through "legally-binding instruments." (CEQA Guidelines, § 15126.4, subd. (a)(2); see also Pub. Resources Code, § 21081.6, subd. (b).) When, as here, the project is publicly financed or undertaken, the mitigation measures must be incorporated into the plan or project design. (CEQA Guidelines, § 15126.4, subd. (a)(2); see also Pub. Resources Code, § 21081.6, subd. (b).) To ensure compliance with the mitigation measures, CEQA also requires the adoption and implementation of a mitigation monitoring program.

---

[5] An exception is recognized if mitigation of the significant environmental effects is not feasible, but a project having such effects may only be approved if the lead agency expressly finds that the benefits of the project outweigh its unmitigable environmental effects. (Pub. Resources Code, § 21081, subds. (a)(3), (b).) Although the majority appears to view this as a significant exception to the requirement of mitigation (maj. opn., *ante*, at p. 14), the adoption of such a finding (called a "statement of overriding considerations") is not the preferred course. (CEQA Guidelines, § 15093, subd. (c).) Agencies understandably seek to avoid the approval of projects that will generate significant adverse environmental effects, and most proposed mitigation measures are "capable of being accomplished in a successful manner within a reasonable period of time," the standard for feasibility. (Pub. Resources Code, § 21061.1.)

(CEQA Guidelines, § 15097, subd. (a); see also Pub. Resources Code, § 21081.6, subd. (a)(1).)

CEQA's mitigation measures play a crucial role in controlling and reducing the environmental impact of projects undertaken in California. The proposed mitigation measures in an EIR outline a series of constraints on the design and execution of a project intended to reduce its environmental impact. The lead agency's adoption of these measures in approving the project imposes these constraints on the project's implementation. Further, by the adoption of a mitigation monitoring program, the lead agency ensures compliance with this CEQA-imposed regulation.

### 3. *Federal Preemption and the Federal Power Act*

The Supreme Court has organized preemption into three categories: Conflict, express, and field preemption. (*Murphy v. National Collegiate Athletic Assn.* (2018) ___ U.S. ___, ___ [138 S.Ct. 1461, 1480] (*Murphy*).) Although the FPA does not expressly preempt state law, the application of CEQA in these circumstances triggers the two other varieties, field and conflict preemption.

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.' " (*Murphy, supra*, ___ U.S. at p. ___, 138 S.Ct. at p. 1480.) "Where Congress occupies an entire field . . . , even complementary state regulation is impermissible. Field pre-emption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." (*Arizona v. United States, supra*, 567 U.S. at p. 401.)

Conflict preemption is further divided into two separate and independent doctrines. It exists (1) "where 'compliance with both state and federal law is impossible,' " or (2) "where 'the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' " (*Oneok, supra*, 575 U.S. at p. 377.) The lower federal courts refer to these distinct subcategories of conflict preemption as "impossibility" and "obstacle" preemption, respectively (e.g., *Chamber of Commerce of the United States v. Bonta* (9th Cir. 2021) 13 F.4th 766, 774), but the Supreme Court has characterized the latter as "purposes and objectives" preemption. (*Hillman v. Maretta* (2013) 569 U.S. 483, 490.) I will use the language of the high court.

The FPA has long been recognized to preempt state regulation of hydropower facilities. As the Supreme Court first held 70 years ago in *First Iowa Coop. v. Power Comm'n* (1946) 328 U.S. 152 (*First Iowa*) and subsequently reaffirmed nearly 40 year later, "the FPA establishes a broad and paramount federal regulatory role." (*California v. FERC* (1990) 495 U.S. 490, 499.) Through a savings clause, 16 United States Code section 821 (Section 27),[6] the FPA preserves some state regulatory authority, but that authority is limited to the determination of " 'proprietary rights' " in the use of water. (*California v. FERC, supra*, 495 U.S. at p. 498; see also *First Iowa, supra*, 328 U.S. at p. 176.) The high court held that state regulation outside the scope of this preserved authority is preempted. (*First Iowa*, at p. 176 ["in those fields where rights

---

[6] Title 16 United States Code section 821 is commonly referred to as "Section 27" due to its numbering in the original legislation, and I observe that convention here.

are not thus 'saved' to the States, Congress is willing to let the supersedure of the state laws by federal legislation take its natural course"].) As the Ninth Circuit later characterized this holding, "The Supreme Court has read the broadest possible negative pregnant into this 'savings clause.' [Citation.] The rights reserved to the states in [Section 27] are all the states get." (*Sayles Hydro*, *supra*, 985 F.2d at p. 454.)

In its seminal *First Iowa* decision, the Supreme Court found preempted the state's attempt to require the proponent of a proposed dam and power plant to obtain a state license for the project, the terms of which would have implemented state law governing the use of its waterways. (*First Iowa*, *supra,* 328 U.S. at pp. 161, 166, 176–178.) As the high court noted, requiring compliance with state law under these circumstances "would subject to state control the very requirements of the project that Congress has placed in the discretion of the Federal Power Commission." (*Id*. at p. 165.) The court ultimately concluded that "[t]he detailed provisions of the [FPA] providing for the federal plan of regulation leave no room or need for conflicting state controls." (*Id*. at p. 181.)

The high court reaffirmed the FPA's broad preemptive effect in *California v. FERC*, which addressed an order issued by our State Water Resources Control Board (Water Board) requiring the operator of a hydropower plant to maintain a greater minimum flow rate in a stream than the minimum rate set by FERC in the plant's license. (*California v. FERC*, *supra*, 495 U.S. at pp. 494–496.) In addressing the preemptive effect of the FPA, the court first rejected the Water Board's challenge to *First Iowa*'s narrow interpretation of the FPA's savings clause, Section 27. Although recognizing that Section 27 might plausibly be read to reserve to the states the power to regulate

stream flow to protect wildlife (*California v. FERC*, at p. 497), the court declined to revisit the earlier ruling. (*Id.* at p. 499.) In holding the Water Board's attempt to impose its own minimum flow rate preempted, the high court reaffirmed that state law is preempted when it either conflicts with federal law or obstructs congressional purposes. It explained: "As Congress directed in [the] FPA [citation], FERC set the conditions of the license, including the minimum stream flow, after considering which requirements would best protect wildlife and ensure that the project would be economically feasible, and thus further power development. [Citations.] Allowing California to impose significantly higher minimum stream flow requirements would disturb and conflict with the balance embodied in that considered federal agency determination" "and would 'constitute a veto of the project that was approved and licensed by FERC.'" (*Id.* at pp. 506, 507.) Because the minimum stream flow requirement was not concerned with proprietary rights in water, the court concluded, it was not insulated from federal preemption. (*Id.* at pp. 498, 506.)

## B. DWR's Use of CEQA Is Preempted by the Doctrine of Field Preemption

As explained above, it is well settled that Section 27 of the FPA limits state regulation in this area to proprietary rights in water and precludes state regulation outside those confines. (*First Iowa*, *supra*, 328 U.S. at pp. 175–176.)

In *Sayles Hydro*, the Ninth Circuit reasonably applied high court precedent in holding that the FPA preempts under the doctrine of field preemption all state regulation beyond the scope of Section 27. (*Sayles Hydro*, *supra*, 985 F.2d at p. 455; see *id.* at p. 456 ["Once [*California v. FERC*] made it clear that the state could control only proprietary rights to water, that

established the category as 'occupy the field' preemption for everything but proprietary rights to water"].) I find no basis for disagreeing with the Ninth Circuit's analysis. Because DWR's application of CEQA purported to regulate the environmental consequences of the Facilities, it falls far outside the regulatory authority left to the states by Section 27 and is therefore preempted.

In *Sayles Hydro*, the Water Board withheld a state operating permit from a hydroelectric plant licensed by FERC because the applicant eventually declined to respond to the Water Board's requests for "a shifting, expanding range of reports and studies, to assure that the project satisfies the [Water] Board's concerns regarding recreation, aesthetics, archaeology, sport fishing, and cultural resources." (*Sayles Hydro, supra*, 985 F.2d at p. 453.) In considering the Water Board's authority over the project, the Ninth Circuit concluded that the state's power was restricted to matters authorized by Section 27. The court recognized that the scope of state authority, judged solely from the language of that statute, was "capable of different interpretations." (*Sayles Hydro, supra*, 985 F.2d at p. 454.) But, the court observed, "we cannot . . . construe this statute on a blank slate. The Supreme Court has read the broadest possible negative pregnant into this 'savings clause.' [Citation.] The rights reserved to the states in this provision are all the states get." (*Ibid*.) Explaining the court's interpretation of the savings clause, the Ninth Circuit noted that "[i]n many states where water is scarce, a state property law regime enables users of streams and wells to obtain proprietary rights in a continuing quantity of water. By perfecting state water rights, users can enjoin other users who deprive them of their share of the flow. [Citation.] This state property law regime in

14

water is what the savings clause reserves, under *First Iowa*."[7] (*Sayles Hydro, supra,* 985 F.2d at p. 455.) In contrast, the court held, "[s]uch proprietary rights are not at issue in the case before us. . . . Since forcing [the plaintiffs] to provide environmental impact reports to the [Water] Board has nothing to do with determining proprietary rights in water, federal preemption bars the state requirements." (*Ibid*.) Although *Sayles Hydro* did not mention CEQA by name, its reference to "environmental impact reports" gives the game away. (*Ibid*.) The court was holding CEQA preempted in connection with the licensing of hydropower projects.

Significantly, the Ninth Circuit addressed and rejected the very approach to preemption adopted in the majority opinion: "The [Water] Board urges that we read *California v. FERC* as establishing federal preemption only where a state requirement conflicts with a federal requirement, not where it supplements a federal requirement. . . . [¶] . . . The ratio decidendi, however, does not take that course. Instead, *California v. FERC* reaffirms *First Iowa*'s narrow interpretation of the savings provision, so that the only authority states get over federal power projects relates to allocating proprietary rights in water. *First Iowa* said that the separation of authority between state and federal governments 'does not require two agencies to share in the final decision of the same issue.' [Citation.] *California v. FERC* reaffirms *First Iowa,* uses the 'occupy the field' characterization 'broad and paramount federal

_____

**7**    The court recognized that *First Iowa*'s discussion of Section 27 could be regarded as dictum, but it held that this contention became moot when *California v. FERC* reaffirmed the ruling. (*Sayles Hydro, supra,* 985 F.2d at p. 455.)

regulatory role,' [citation], and plainly states that 'constricting § 27 to encompass only laws relating to proprietary rights' accomplishes this 'no sharing' purpose. . . ." (*Sayles Hydro*, *supra*, 985 F.2d at pp. 455–456, fn. omitted.) As the court added: "Once the [*First Iowa*] Court made it clear that the state could control only proprietary rights to water, that established the category as 'occupy the field' preemption for everything but proprietary rights to water." (*Id*. at p. 456.)

*Sayles Hydro* continued, in an observation of obvious application here: "In the case at bar, it is clear that the federal laws have occupied the field, preventing state regulation. This conclusion is strengthened by the fact that most or all of the [Water] Board's concerns were considered by [FERC] in granting the license, and conditions were imposed in the license to protect these multiple values. . . . There would be no point in Congress requiring the federal agency to consider the state agency recommendations on environmental matters and make its own decisions about which to accept, if the state agencies had the power to impose the requirements themselves." (*Sayles Hydro*, *supra*, 985 F.2d at p. 456.)

The majority argues that "*First Iowa* and *California v. FERC* could be read to apply either conflict or field preemption." (Maj. opn., *ante*, at p. 18.) *Sayles Hydro* acknowledged as much (*Sayles Hydro*, *supra*, 985 F.2d at pp. 455, 456), and the point does not answer the Ninth Circuit's careful analysis of the language of those cases in finding field preemption. As *Sayles Hydro* determined, the high court's decisions lead inescapably to the conclusion that field preemption precludes state regulation in this area.

The majority faults *Sayles Hydro* for relying on a savings clause, noting that "the statute does not say that these matters are the only matters reserved." (Maj. opn., *ante*, at p. 19.) The Supreme Court, however, has long since resolved this issue, holding that matters outside the savings clause are preempted, a ruling that is binding on us regardless of the language of Section 27. (*First Iowa, supra*, 328 U.S. at p. 176 ["in those fields where rights are not thus 'saved' to the States, Congress is willing to let the supersedure of the state laws by federal legislation take its natural course"].)

The majority points out that none of the cases cited, *First Iowa*, *California v. FERC,* and *Sayles Hydro*, expressly declared that field preemption applies to federally regulated public agencies. (Maj. opn., *ante*, at p. 19.) The omission is understandable because all of the cases concerned state regulation of private parties, rather than a public agency. But if Congress occupies a field, it does so regardless of the identity of the party affected by the state regulation; application of the doctrine of field preemption has never been held to depend upon the nature of the party being regulated. Notably, the majority cites no case holding that state regulation preempted by the doctrine of field preemption when applied to a private party is not similarly preempted if applied to a public agency, even when the public agency applies that regulation to its own conduct. *Eel River* comes closest, but, for the reasons discussed below, it does not apply here.

The Ninth Circuit's analysis and conclusions in *Sayles Hydro* are sound. Under *First Iowa* and *California v. FERC*, Congress has occupied the field of hydropower licensing and operation outside the authority reserved to states under Section 27. DWR's application for relicensing did not concern

proprietary rights to water. The agency's use of CEQA was therefore preempted.

### C. DWR's Use of CEQA Is Also Preempted by the Doctrine of Purposes and Objectives Preemption

Even if Congress had not occupied the field of hydropower regulation, the nature of CEQA and its application in these circumstances would still require a finding of preemption because CEQA stands as a substantial obstacle to the accomplishment of the purposes and objectives of Congress in enacting the FPA.

It bears repeating that CEQA is an important regulatory statute, requiring the imposition of restrictions on the manner in which public and private projects are designed and operated to minimize their adverse environmental impacts. When it undertook to comply with CEQA, DWR characterized the project under review as implementation of the settlement agreement — in other words, as the future operation of the Facilities under the terms proposed in that agreement. DWR's use of CEQA therefore required it to adopt a series of mitigation measures, enforceable by DWR through a mitigation monitoring program, addressing the precise subject matter of the FERC license. The FPA, however, vests exclusive regulatory authority over the operation of hydropower projects like the Facilities in FERC. DWR's use of CEQA necessarily stands as an obstacle to the full accomplishment of the congressional purpose and objective of vesting exclusive regulatory authority over the operation of hydroelectric power plants in the federal government.

In addition, DWR's invocation of CEQA in the midst of the ALP, a unique federal licensing process clearly designed to

duplicate and thereby supplant the need for state environmental review, constituted a second, equally disruptive obstacle to achieving the congressional purpose of vesting exclusive control over hydropower licensing in FERC.

In applying the doctrine of purposes and objectives preemption, "[w]hat is a sufficient obstacle [to the accomplishment of Congress's purposes and objectives] is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 373 (*Crosby*).) As this instruction suggests, " 'the purpose of Congress is the ultimate touchstone' " in determining whether state law is preempted. (*Wyeth v. Levine* (2009) 555 U.S. 555, 565.) Even if the federal and state laws share the same goal, "[a] state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." (*International Paper Co. v. Ouellette* (1987) 479 U.S. 481, 494 (*Ouellette*).)

The obvious first step in a purposes and objectives preemption analysis is to identify the purposes and objectives of the federal law. (*Crosby*, *supra*, 530 U.S. at p. 373.) As the majority acknowledges, "The overriding purpose of the FPA is to facilitate the development of the nation's hydropower resources. (*First Iowa*, *supra*, 328 U.S. at pp. 174, 180.) A primary tool in achieving that goal was to centralize regulatory authority in the federal government in order to remove any obstacles to such development posed by state regulation." (Maj. opn., *ante*, at p. 23.) This intent is made manifest by Section 27, which restricts state law in this area to laws governing proprietary rights in water. (*California v. FERC*, *supra*, 495 U.S. at p. 498; *First Iowa*, at p. 176.) The Congressional objective was therefore

to promote the development of hydropower resources; an important means it chose to accomplish that objective was to grant FERC exclusive control over the licensing and regulation of hydropower facilities.

DWR's invocation of CEQA following its submission of a license application to FERC necessarily created the risk that the EIR would identify significant potential environmental effects resulting from operation of the Facilities, which would, in turn, trigger the required formulation and adoption of mitigation measures to reduce those effects. The mitigation measures, legally enforceable constraints governing the manner in which a project is designed and operated, are regulations in all but name. Because the project identified in the EIR, the operation of the Facilities under the terms proposed in the settlement agreement, was, as a practical matter, indistinguishable from the subject of the FERC license, at least some, if not all, of the mitigation measures identified in the EIR would inevitably overlap with the authority granted FERC by the FPA. Once adopted, such mitigation measures would impose mandatory conditions on the operation of the Facilities that were in addition to the license conditions ultimately imposed by FERC.

And that is what occurred. In certifying the EIR, DWR identified significant adverse environmental effects and adopted six pages of mitigation measures and a mitigation monitoring program. The mitigation measures directly addressed, and purported to constrain, the manner in which the Facilities could operate with respect to the many factors affecting its impact on the environment. Because these same factors are subject to FERC's regulatory authority, DWR's certification of the EIR, in effect, created an alternative set of regulations governing operation of the Facilities and designated an agency other than

FERC to enforce these regulations.  DWR's use of CEQA in this manner presented an obstacle to the accomplishment of the full purposes and objectives of Congress precisely because a primary purpose of the FPA, by vesting exclusive regulatory authority over the operation of hydropower facilities in FERC, was to preclude just the type of state regulation created by adoption of the mitigation measures and their monitoring program.

The majority acknowledges that any mitigation measures adopted by DWR that conflict with the eventual FERC license would be preempted (maj. opn., *ante*, at p. 27), but that does not solve the more fundamental problem.  CEQA serves as an obstacle to the accomplishment of congressional purposes regardless of whether the mitigation measures adopted by DWR are in *direct* conflict with the provisions of the FERC license, including when state law interferes with the methods by which the federal statute was designed to reach its goals.  (*Ouellette*, *supra*, 479 U.S. at p. 494.)  Regardless of whether DWR's mitigation measures are in direct conflict with the eventual terms of the FERC license, the adoption of the mitigation measures and a program to enforce them created an alternative regulatory regime governing operation of the Facilities that is independent of the FERC license and purports to vest regulatory authority in an agency other than FERC.  These actions will cause unnecessary confusion about the nature of the regulations properly governing operation of the Facilities and create the potential for future conflict over the proper roles of DWR and FERC in regulating those operations.  They are therefore

preempted as an obstacle to achieving the full Congressional purpose.[8]

In addition, to meet its objectives Congress granted FERC exclusive control not only over the terms of an eventual license but also over the conduct of the licensing proceedings. Because the implementation of CEQA in the midst of an ALP proceeding is inconsistent with that process, it stands as an independent obstacle to the accomplishment of federal purposes and objectives. Again, that risk was realized here.

The ALP was designed not merely to focus the participants' attention on environmental concerns, but also to supplant the need for independent environmental review under state law. The ALP commences with the preparation of a PDEA, the functional equivalent of the type of informational document typically required by environmental review statutes such as CEQA and NEPA. In other words, state environmental review is already an integral part of the ALP. The inclusion of this requirement was clearly intended to make it unnecessary for an

---

[8] The majority contends that this analysis disregards a decades-long history of coexistence between CEQA and exclusive federal regulation. (Maj. opn., *ante*, at p. 21.) But I am hardly the first to suggest that CEQA is preempted in this context. *Sayles Hydro* so holds (*Sayles Hydro*, *supra*, 985 F.2d at p. 455); we suggested as much in *Eel River* (*Eel River*, *supra*, 3 Cal.5th at p. 715); and a New York appellate court held that application of the state's environmental protection law was preempted when applied to a Section 401 certification in *Matter of Eastern Niagara Project Power Alliance v. State Department of Environmental Conservation* (N.Y.App.Div. 2007) 840 N.Y.S.2d 225, 229. In light of this history, the mere fact that CEQA's application to a *public* project has not been the subject of a published appellate opinion says nothing about the merits of the claim.

applicant to perform its own environmental review under state law, thereby streamlining the licensing process and avoiding delays and regulatory conflicts found here. To further ensure the protection of environmental values, the ALP also requires FERC to prepare an EIS. Given the design of the ALP, the preparation of an EIR is redundant and unnecessary to ensure proper consideration of environmental concerns.

There is another problem (and one readily apparent from these proceedings): CEQA's provision for judicial review is not contemplated by the ALP and is entirely inconsistent with an efficient licensing process. The ALP provides for judicial review of FERC licensing decisions, but that review occurs in the United States Courts of Appeals after an order has been issued. (16 U.S.C. § 825l(b).) A judicial action in state court challenging the conduct of the licensing proceeding, as here, is wholly outside the contemplation of the ALP. There is little doubt that CEQA's provision for judicial review stands as a sizable obstacle to Congress's objective of granting FERC exclusive control over hydropower licensing.

The majority rightly maintains that " ' "a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act." ' " (Maj. opn., *ante*, at p. 16, quoting *Chamber of Commerce of the United States of America v. Whiting* (2011) 563 U.S. 582, 607 (plur. opn. of Roberts, C. J.).) I am persuaded that the threshold is satisfied here. The required adoption of mitigation measures and a mitigation monitoring program unavoidably interferes with FERC's exercise of exclusive federal authority; the preparation of an EIR needlessly replicates procedures already a part of the federal licensing process; and the provision for civil enforcement of CEQA creates a readily realized risk of interference with

FERC's control of the licensing process. In sum, there are compelling reasons to find CEQA preempted in its entirely, and little reason to resist that conclusion.

### D. *Eel River* Does Not Exempt CEQA from Preemption in These Circumstances

As the majority concedes, the foregoing considerations might well be conclusive in requiring field preemption of state regulation if the applicant were a private entity. (Maj. opn., *ante*, at p. 17 [if a private party were being regulated, "these arguments may have prevailed"]; *id* at p. 18 [distinguishing *Sayles Hydro* as involving "the licensing of a private entity"].) But the majority consistently relies on DWR's status as a public entity and my decision in *Eel River* to justify its decision to impose limited preemption in these circumstances. (Maj. opn., *ante*, at pp. 21–22.) Unlike the majority, however, *Eel River* did not find partial preemption. Rather, as discussed below, we found CEQA *exempt* from preemption by the Interstate Commerce Commission Termination Act of 1995 (ICCTA; 49 U.S.C. § 10101 et seq.), which grants the federal government exclusive jurisdiction over the nation's rail transport. In acknowledging that CEQA *is* preempted by the FPA, at least to the extent it directly conflicts with the FPA, the majority implicitly concedes that the factors exempting CEQA from preemption in the circumstances of *Eel River* are not present here.

The lead agency in *Eel River*, the North Coast Railroad Authority (Railroad Authority), was created by the Legislature to revitalize an abandoned intrastate rail line in Northern California. (*Eel River*, *supra*, 3 Cal.5th at pp. 691–692.) Those efforts were governed by the ICCTA, which grants exclusive regulatory authority over railroads to the federal government.

The ancestor statute of the ICCTA was motivated by concerns over state regulation comparable to those that brought about the FPA (*Eel River*, *supra*, 3 Cal.5th at p. 708), but by the time of *Eel River* the legislation had long since been amended to promote *de*regulation. While regulation of the rail industry was greatly diminished, exclusive federal regulatory authority was maintained. (*Eel River*, at pp. 709–710.)

As part of its deregulatory mission, the Surface Transportation Board (STB), the federal agency responsible for enforcing the ICCTA, had exempted the Railroad Authority from the ordinary requirement to obtain a certificate of operation, leaving the agency's proposed activity effectively unregulated by federal authorities. (See *Eel River*, *supra*, 3 Cal.5th at pp. 695, 709–710.) The Railroad Authority initially followed CEQA procedures in planning for the resumption of rail service (*Eel River*, at pp. 696–697), but it later reversed course, declaring CEQA preempted by the ICCTA. (*Eel River*, at p. 700.) Despite the long history of federal preemption of local rail regulation, *Eel River* rejected the Railroad Authority's claim that the ICCTA preempted the state's application of CEQA.

We began our discussion by acknowledging that the application of CEQA to an equivalent *private* project would be preempted. (*Eel River*, *supra*, 3 Cal.5th at p. 715.) As we observed, "Although CEQA does not on its face specifically regulate rail transportation, its enforcement mechanisms requiring environmental compliance as a condition of project approval involving a private rail carrier would have the effect of regulating rail transportation, a result inconsistent with 49 United States Code section 10501." (*Eel River*, at p. 715.) But we contrasted this with a state agency's application of CEQA to its own rail project, which "operates as a form of self-

25

government" because the agency is, in effect, regulating itself. (*Eel River*, at p. 723.)

Importantly, our conclusion in *Eel River* that CEQA was not preempted under the circumstances did *not* purport to constitute a general ruling that CEQA is insulated from preemption in connection with all federal regulation of state-sponsored projects.  The majority's application of impossibility preemption here is an implicit acknowledgment of this limit. Rather, the ruling in *Eel River* that the Railroad Authority was exempt from preemption rested on two circumstances unique to the ICCTA.  The first was the absence of federal regulation, made manifest by the STB's issuance of an exemption from the certificate requirement.  As we noted, upon issuance of such an exemption, "the railroad owner has a protected domain that is subject neither to federal nor to state regulation, a freedom to plan, develop, and restore rail service on market principles . . . ." (*Eel River, supra,* 3 Cal.5th at pp. 723–724.)  "[W]ithin the deregulated zone, the state as owner may make its decisions based on its own guidelines . . . ." (*Id.* at p. 724.)  In light of CEQA's role in planning for the operation of the rail line, we held, its application was not preempted in this deregulated context.

It cannot be seriously contended that this rationale supports a finding of no preemption in this matter.  The regulatory circumstances here are in direct contrast to those prevailing in *Eel River*.  FERC has exercised its exclusive right to regulate operation of the Facilities, and DWR has engaged in a years-long licensing process in compliance with FERC's exercise of that authority.  There is no "deregulated zone."

Our second ground for declining to find CEQA preempted in *Eel River* recognized CEQA's role in intergovernmental regulation. We noted that the application of CEQA "constitutes the state's governance of its own subdivision [i.e., the Railroad Authority], a matter of self-management that the ICCTA presumptively was not intended to entirely preempt." (*Eel River, supra*, 3 Cal.5th at pp. 725–726.) We found the language of the ICCTA insufficiently clear to justify an interpretation that "would infringe on state sovereignty" in the manner proposed. (*Eel River*, at p. 726.)

This aspect of our reasoning relied on two Supreme Court decisions, *Gregory v. Ashcroft* (1991) 501 U.S. 452 (*Gregory*) and *Nixon v. Missouri Municipal League* (2004) 541 U.S. 125 (*Nixon*). In *Gregory*, the court held that federal age discrimination laws did not preempt a state's constitutional provision requiring state judges to retire at age 70. (*Gregory,* at p. 464.) In explanation, the high court noted that setting judicial qualifications "goes beyond an area traditionally regulated by the States; it is a decision of the most fundamental sort for a sovereign entity. . . . [¶] Congressional interference with this decision . . . would upset the usual constitutional balance of federal and state powers." (*Id.* at p. 460.) The court declined to find preemption in such circumstances unless Congress had made " 'its intention to do so "unmistakably clear in the language of the statute." ' " (*Ibid.*)

*Nixon* addressed the preemptive effect of a federal statute that prevented states from "prohibiting the ability of any entity to provide" telecommunications services. (*Nixon, supra*, 541 U.S. at p. 128, quoting 47 U.S.C. § 253(a).) Despite the statute's broad language, *Nixon* declined to find preempted a state law prohibiting the state's *own* local governments from providing

such services.  (*Nixon*, at p. 138.)  Drawing on *Gregory*, the court recognized that preempting the telecommunications ban "would come only by interposing federal authority between a State and its municipal subdivisions."  (*Nixon*, at p. 140.)  Given this circumstance, the court in *Nixon* "invoke[d] our working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be . . . read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement *Gregory* requires."  (*Ibid.*)  Finding no unmistakably clear language in the federal statute requiring preemption in the circumstances, *Nixon* declined to do so.  (*Id*. at p. 141.)

The FPA's language, as consistently interpreted by the Supreme Court since *First Iowa*, makes unmistakably clear Congress's intent to preempt CEQA in the present circumstances, regardless of CEQA's impact on inter-governmental relations.  As discussed, Section 27, the FPA's savings clause, defines the rights reserved to the states under the statute.  The high court has on numerous occasions emphasized the limited nature of Section 27 and the broad reach of the FPA.  As the high court held in *First Iowa*, "in those fields where rights are not thus 'saved' to the States, Congress is willing to let the supersedure of the state laws by federal legislation take its natural course."  (*First Iowa, supra*, 328 U.S. at p. 176.)  Section 27 contains no exception to preserve state regulation touching inter-governmental relations.

In other words, well over a half-century ago the FPA was construed to preempt *all* state laws relating to the licensing of hydroelectric power plants, except to the extent such state legislation governs proprietary rights in water.  The limited scope of the FPA's savings clause was subsequently reaffirmed

in *California v. FERC*, which held that Section 27 "provides the clearest indication of how Congress intended to allocate the regulatory authority of the States and the Federal Government" under the act. (*California v. FERC*, *supra*, 495 U.S. at p. 497.) The high court recognized that it has "endorsed and applied *First Iowa*'s limited reading of [Section] 27, [citations], and has employed the decision with approval in a range of decisions, both addressing the FPA and in other contexts." (*California v. FERC*, at p. 499.) Further, "Congress has amended the FPA to elaborate and reaffirm *First Iowa*'s understanding that the FPA establishes a broad and paramount federal regulatory role," including by amending the statute to require FERC to adopt provisions for the protection of fish and wildlife in its licenses. (*Id.* at p. 499; see also *id.* at p. 500.)

The majority notes the lack of any express language in the FPA requiring the preemption of state regulation touching inter-governmental relations. (Maj. opn., *ante*, at p. 21.) But neither *Eel River*, *Nixon*, nor *Gregory* requires a literal statement of intent to preempt self-government. Rather, these decisions require that congressional intent to preempt the relevant state law must be "unmistakably clear." (*Eel River*, *supra*, 3 Cal.5th at p. 731; see *Gregory*, *supra*, 501 U.S. at pp. 460–461; *Liberty CableVision of Puerto Rico, Inc. v. Municipality of Caguas* (1st Cir. 2005) 417 F.3d 216, 221 [finding "unmistakably clear" requirement met despite absence of any reference to inter-governmental relations in statutory preemption clause].) By accepting a well-settled and consistently restrictive judicial interpretation of the savings clause, augmented by statutory amendments accommodating that interpretation, Congress has made unmistakably clear the broad preemptive reach it intends for the FPA: State regulation

outside the savings clause — i.e., state law regulating matters other than proprietary rights in water — is preempted. For the reasons discussed above, that reach compels the conclusion that CEQA is preempted under these circumstances, regardless of any interference that preemption might cause to relations between the state and its subdivisions.

The majority's holding, if not its discussion, makes clear that the majority does not find applicable here the second rationale in *Eel River*. That rationale relied on high court authority holding that the overriding importance of state legislation governing intergovernmental relations makes it immune from preemption unless Congress has unmistakably indicated otherwise. As a consequence, any legislation subject to this second rationale is exempt from preemption. In *Gregory*, the Supreme Court held that a state's mandatory judicial retirement age prevailed over the contrary requirements of federal anti-discrimination law. *Nixon* held the same. Although a federal law forbade states from precluding entities from providing telecommunications services, the Supreme Court upheld a state statute that did just that. When the circumstances addressed by these cases are present, preemption simply does not operate.

In holding that CEQA is preempted in these circumstances, the majority implicitly finds that the unusual circumstances underlying *Eel River* are absent. If the FPA indeed lacks language making unmistakably clear a congressional intent to preempt CEQA in these circumstances, *Gregory* and *Nixon* — and *Eel River*, for that matter — demand the conclusion that preemption is absent entirely. Yet the majority concedes that CEQA is preempted here to the extent it directly conflicts with FERC regulation. This would appear to

be an expansion of *Eel River*, but the scope and application of the exception is left unclear.

### E. The Majority's Ruling Is Unworkable and Serves Little Practical Purpose

Preemption is ultimately an issue of law, not practicality. But the difficulty of meshing the majority's scheme of partial preemption with the implementation of CEQA in these circumstances illustrates the wisdom of precluding state regulation when the federal government has assumed exclusive regulatory authority.

This unworkability begins with the majority's treatment of CEQA's civil enforcement mechanism. The majority permits a CEQA compliance lawsuit to proceed, so long as it does not seek to interfere with the FERC licensing proceedings. But, as noted above, FERC is not bound, either by the majority's ruling or CEQA. Once any other necessary permits are obtained, including a Clean Water Act certificate, FERC is free to issue a license and move on. It need not await the resolution under state law of issues of CEQA compliance. Yet issuance of a license plainly moots any compliance lawsuit, practically if not legally. If the EIR is found deficient, DWR can, perhaps, be forced to compile a compliant EIR, but it will be for naught. The FERC license will have issued, and any DWR dissatisfaction with the license must be resolved in a federal lawsuit, not through CEQA proceedings. Although DWR is presumably permitted to impose further mitigation measures consistent with the FERC license after its issuance, the agency would be free to adopt such practices outside the context of CEQA in any event. The FERC license inevitably provides no more than a guide to project operation that must be implemented by DWR

through its administration of the facilities. CEQA adds nothing to this process.

The practical problems with the majority's treatment of mitigation measures inconsistent with the FERC license are more significant. Because, as here, CEQA compliance will precede issuance of the FERC license, DWR will be unable to determine at the time of their adoption whether any particular mitigation measures will be consistent with the terms of the FERC license. Yet the majority concedes that inconsistent mitigation measures are preempted. Because inconsistent mitigation measures are not self-preempting, they will remain binding on the agency as a matter of (non-preempted) state law unless declared preempted by an appropriate court. In the meantime, DWR will be bound by two inconsistent regulations, one binding under state law and one binding under federal law, and forced to violate either one or the other.

Even assuming FERC, DWR, or a third party brings an appropriate action to have a conflicting mitigation measure declared preempted, the problems do not end there. Given the majority's holding that CEQA applies to projects covered by a FERC licensing proceeding, those projects require lead agency approval under CEQA. Any such approval will require, as discussed above, a finding that the project's adverse environmental effects have been mitigated to insignificance, a finding based on adoption of mitigation measures. As a consequence, any declaration that a mitigation measure is unenforceable necessarily invalidates the agency's project approval under CEQA, premised on the mitigation measure. Operation of the project may thereby be rendered unlawful under state law until a new CEQA proceeding results in a valid project approval.

These conundrums highlight a fundamental problem with the majority's holding. CEQA was enacted to govern projects governed by *state* law and requiring *state* regulatory approval. CEQA was not intended or designed to operate in a manner subordinate to a superior federal regulatory scheme. There is no provision in CEQA for partial implementation. An agency cannot use CEQA solely for informational purposes, without adopting mitigation measures when required. Nor can an agency implement CEQA without exposing its compliance to a civil enforcement lawsuit. The practical problems cited above are all a result of the majority's attempt to shoehorn CEQA into a circumstance in which its use is redundant and, under governing federal law, preempted. There is no indication that the Legislature intended CEQA to operate in the manner required by the majority, or would approve of it.

The lack of a clear doctrinal basis for the majority's version of preemption will create further problems of its own. The majority seems to hold that when a public agency sponsors a project requiring federal approval, the ordinary rules of preemption do not apply; at a minimum, the agency's action is not subject to field preemption and purposes and objectives preemption. The majority justifies this partial preemption under *Eel River*, but, as discussed above, because the ruling goes well beyond the holding of that case, the boundaries, application, and jurisprudential basis of this partial preemption remain obscure. And there is no way to determine what other state statutes, if any, are covered by the ruling. All of this uncertainty will guarantee further litigation every time a public agency invokes a state statute in the midst of a federal licensing proceeding, adding to the cost, length and burden of such proceedings. In addition, because there is no reason to believe

the federal courts will follow the majority in its flight — the federal district courts in California, for example, are bound by *Sayles Hydro*'s adherence to *First Iowa* and *California v. FERC* — we can expect different results in litigation commenced in the respective jurisdictions. As a result of the majority's ruling, CEQA is deemed preempted in litigation commenced in federal court, while it is subject only to impossibility preemption in litigation commenced in our courts.

Putting aside the unworkability of the majority's vision of limited CEQA preemption, the most disturbing aspect of its ruling is the lack of any practical benefit from its bending of the preemption rules. The implementation of CEQA here is neither necessary, nor even important. There is no claim on any side that environmental concerns are given short shrift in the FERC licensing process. As noted, the ALP appears designed specifically to render state environmental review unnecessary. The ALP requires, at the outset of the process, the creation of a document that is the full equivalent of an EIR. The majority does not contend otherwise. The applicant is then required to negotiate with all other interested parties to reach consensus on the terms of a proposed FERC license. Given the nature of hydropower projects and the parties interested in their operation, environmental concerns are likely to be in the forefront. The majority does not identify any environmental concerns that were overlooked in the formulation of the DWR settlement agreement. Yet FERC then performs its *own* environmental analysis under NEPA, involving the preparation of a second environmental review document, the EIS. Environmental protection is plainly among the top priorities of the ALP. CEQA adds nothing.

Against this background, the majority fails to articulate any persuasive reason for preserving state environmental review over the clear dictates of the supremacy clause. The project considered by DWR's EIR — the operation of the Facilities under the settlement agreement — is virtually identical to the project considered in FERC's EIS. Contrary to the majority's claim (maj. opn., *ante*, at p. 29), the EIS was not prepared at an "earlier stage[]" in the ALP. It occurred immediately prior to DWR's redundant preparation of the EIR. Neither DWR nor the majority have identified a deficiency in either NEPA or FERC's EIS that made this duplication of effort necessary, or even efficacious.[9]

DWR contends that it invoked CEQA in order to decide whether to accept the amendments proposed by FERC to the terms of a license proposed in the settlement agreement, and the majority accepts the explanation. (Maj. opn., *ante*, at p. 2.)[10]

---

[9] The majority also theorizes that "a compliant EIR can still inform the state agency concerning actions that do not encroach on FERC's jurisdiction." (Maj. opn., *ante*, at p. 29.) If DWR had carefully defined the project under CEQA review in a manner that avoided FERC jurisdiction, DWR might also have avoided preemption. But that is demonstrably not this case. As explained above, the project studied by DWR in its EIR was the exact subject of FERC regulation — future operation of the Facilities under the terms of the settlement agreement.

[10] As the majority observes, "DWR relied on the EIR to analyze the environmental impact of operating the Oroville Facilities under the settlement agreement or an alternative proposed by FERC staff. The EIR serves as the informational source for DWR's decisionmaking as to whether to request particular terms from FERC as it contemplates the license . . . or to seek reconsideration of terms once FERC issues the

But those new terms had *already* been the subject of complete environmental review in the EIS, in addition to its full environmental review of the settlement agreement's proposal. Such review is presumably the very purpose of the ALP's requirement of an EIS at this stage of the process — to make unnecessary an independent state environmental review, including review of any changes FERC might propose to the terms of a settlement agreement. There was no need for DWR to repeat the environmental review process to reach conclusions about the effect and desirability of FERC's proposal. FERC had done the work for them. Tellingly, neither DWR nor the majority has identified deficiencies in the EIS analysis that were uncovered by DWR's EIR.

DWR's rationalization ignores the duplication of effort represented by its pursuit of CEQA. Any information developed by DWR to aid its decision-making had already been developed and revealed in FERC's EIS. The EIR added nothing to the store of information on which DWR's decision makers were required to act and will add nothing to their evaluation of the FERC proposal, should that proposal ever be communicated. The majority's rationale reduces to this: DWR was entitled to do the analysis itself, even if that duplication of effort served no other purpose. It seems a small benefit to justify upsetting the proper application of the rules of preemption.

The impact of the majority's ruling is magnified by the mandatory nature of CEQA compliance. The application of CEQA is not discretionary; when a public agency proposes to

---

license . . . ." (Maj. opn., *ante,* at p. 2.) Of course, FERC's EIS considered exactly the same matters, and there is no claim that FERC's work was inadequate.

undertake a project that might cause a physical change in the environment, the agency *must* engage in CEQA procedures. (Pub. Resources Code, §§ 21001.1, 21065, 21080.)  In *Eel River*, we found no preemption of CEQA in circumstances in which the use of CEQA served an important public purpose, given the federal government's exemption of the state's project from an otherwise exclusive scheme of federal regulation.  That limited ruling was well grounded in law and public policy; CEQA was permitted to fill the regulatory vacuum created by the exemption.  In today's ruling, the majority appears to have extended that ruling — granted, subject to impossibility preemption — to every state and local public project subject to exclusive federal regulation.  Because CEQA compliance is mandatory, public agencies subject to exclusive federal regulation now will be *required* to pursue CEQA regardless of whether, as in this case, it serves no practical or regulatory purpose.  Public agencies will be required to duplicate federal or, as in this case, their *own* environmental studies, run the risk of allowing CEQA enforcement proceedings to interfere with the licensing proceedings, and create their own, potentially conflicting regulatory scheme through the adoption of mitigation measures.

The absence of any meaningful regulatory or practical justification for DWR's invocation of CEQA reveals the majority's opinion for what it is:  The preservation of state regulatory authority for its own sake.  The proper role of our court in the application of the Supreme Court's supremacy clause jurisprudence should be to *prevent* such vain assertions of state power, not to promote and facilitate them.

## III. CONCLUSION

In its haste to acquiesce to DWR's pointless and redundant invocation of CEQA, the majority has devised its own version of federal preemption, relying on a vague and inappropriate application of *Eel River*. The majority's new preemption tolerates state interference in exclusive federal authority so long as the state's interference does not "directly" conflict with federal action — in other words, so long as the state does not create a situation in which it is impossible simultaneously to comply with state and federal mandates. This limited preemption may seem appropriate to the majority, but it bears no resemblance to the United States Supreme Court's articulation of the doctrine of preemption, which must be our guide. In adopting its own version of preemption, the majority tolerates DWR's unnecessary delay of FERC's licensing proceedings, turns a blind eye to Congress's invocation of field preemption through the enactment of Section 27, and sweeps purposes and objectives preemption under the rug. Although I concur with the majority to the extent it finds certain aspects of CEQA's implementation here preempted, I decline to adopt the majority's version of preemption and would favor a faithful application of the high court's law of preemption. I would affirm the judgment of the Court of Appeal.


**CANTIL-SAKAUYE, C. J.**


**I Concur:**
**CORRIGAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  County of Butte v. Department of Water Resources

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX Opn. filed 9/5/19, ordered nonpub. 12/11/19 — 3d Dist
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S258574
**Date Filed:** August 1, 2022

_____

**Court:**  Superior
**County:**  Yolo
**Judge:**  Daniel P. Maguire

_____

**Counsel:**

Bruce Alpert, County Counsel; Rossmann and Moore, Antonio Rossmann, Barton Lounsbury; Law Office of Roger B. Moore, Roger B. Moore; Shute Mihaly & Weinberger, Ellison Folk and Edward T. Schexnayder for Plaintiff and Appellant County of Butte.

R. Craig Settlemire, County Counsel; Law Office of Roger B. Moore, Roger B. Moore; Law Offices of Michael B. Jackson and Michael B. Jackson for Plaintiffs and Appellants County of Plumas and Plumas County Flood Control and Water Conservation District.

E. Robert Wright for Sierra Club, Center for Biological Diversity, Friends of the River, California Sportfishing Protection Alliance and Friends of the Eel River as Amici Curiae on behalf of Plaintiffs and Appellants.

Law Office of Adam Keats and Adam Keats for California Water Impact Network and Aqualliance as Amici Curiae on behalf of Plaintiffs and Appellants.

Laura E. Hirahara for California State Association of Counties as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Michael J. Mongan, State Solicitor General, Janill L. Richards, Principal Deputy State Solicitor General, Robert W. Byrne, Assistant Attorney General, Joshua Patashnik and Aimee Feinberg, Deputy State Solicitors General, Randy L. Barrow, Tracy L. Winsor, Deborah L. Barnes, Matthew J. Goldman, Carolyn Nelson Rowan and Linda L. Gandara, Deputy Attorneys General, for Defendant and Respondent.

The Sohagi Law Group, Margaret M. Sohagi, Philip A. Seymour; Duane Morris, Thomas M. Berliner, Paul J. Killion, Jolie-Anne S. Ansley; Downey Brand and David R.E. Aladjem for Real Parties in Interest and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Edward T. Schexnayder
Shute Mihaly & Weinberger LLP
396 Hayes Street
San Francisco, CA 94102
(415) 552-7272

Joshua Patashnik
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3896

Jolie-Anne S. Ansley
Duane Morris LLP
Spear Tower
One Market Street, Suite 2200
San Francisco, CA 94105-1127
(415) 957-3320